■ In the Matter of RICHARD NICHOLS, Petitioner, v NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES, Respondent. [49 NYS3d 775]—

Egan Jr., J. Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent finding, among other things, that petitioner had engaged in untrustworthy conduct, and imposed a fine.

At all times relevant, petitioner was licensed in this state as an insurance agent/broker. In 1999, petitioner was contacted by Mutual Benefits Corporation (hereinafter MBC), a Florida-based company, about the possibility of becoming a sales agent for its products. Thereafter, between 2001 and 2004, petitioner sold viatical settlement agreements to investors on behalf of MBC.

By all accounts, a viatical settlement agreement is one in which the original holder of a life insurance policy, i.e., the insured or, as relevant here, the viator, sells his or her interest in the policy to a settlement company for a discounted lump-sum payment. The settlement company then becomes the beneficiary of the policy in question (and assumes responsibility for the premium payments due thereon) and either retains a whole interest in the policy or sells off percentages thereof to investors. The benefit payout matures—and is dependent—upon the death of the viator, typically an elderly or terminally ill individual, and the investor realizes a profit only if the policy benefit paid is greater than the discounted purchase price plus any additional premiums that may become due. The amount of the lump-sum payment made to the viator is based upon his or her anticipated life expectancy; hence, in the event that a particular viator exceeds his or her estimated life expectancy, additional premium payments on the policy would become due and could reduce—or even eliminate—the profit from the death benefit ultimately paid.

During the relevant time period, petitioner sold approximately 400 interests in viatical settlements to roughly 200 clients, and each client signed a 23-page, largely single-spaced contract with MBC. In conjunction therewith, MBC provided its agents with "ad slicks" or advertisements to assist in marketing the viatical settlements. The advertisement selected by petitioner in 2001 proclaimed "NOW THERE'S A BETTER ALTERNATIVE TO THE TRADITIONAL CD OR ANNUITY," indicated that investors would "EARN 12-72% DOUBLE-DIGIT FIXED RETURN" and advised that "12, 18, 24, 48, 60 or 72 Month Plans" were available. No mention of viatical settlements was made in the advertisement, and no disclaimers were contained therein. Although petitioner sold interests in viatical settlements to many of his existing clients, at least two individuals contacted petitioner in response to this advertisement.[1] MBC paid petitioner a commission—between 1.5% and 12%—for each interest in a viatical settlement that he sold.[2]

---

**1.** Although the former Department of Insurance investigated this advertisement in 2003 for compliance with the provisions of Insurance Law § 2122, which governs advertising by insurance producers, the Department subsequently closed its file—concluding that the matter was "outside of [its] jurisdiction."

**2.** In 2004, the Securities and Exchange Commission accused MBC of engaging in a Ponzi scheme based upon, among other things, its failure to escrow sufficient funds in a reserve account to pay the future premiums due on the subject policies, thereby resulting in a loss to investors of millions of

In June 2011, respondent issued a citation charging petitioner with untrustworthiness within the meaning of Insurance Law § 2110 (a) (4)—alleging that petitioner, among other things, "used misleading newspaper advertisements" to market the viatical settlements and "failed to inform clients of the risks of investing in viatical settlement purchases through MBC." Following multiple hearings in 2011 and 2012, the Hearing Officer found that petitioner had "committed numerous acts of untrustworthiness and incompetence" and, as to penalty, recommended that petitioner's licenses with respondent be revoked. Petitioner's subsequent challenge to the Hearing Officer's recommendation was partially successful; respondent's acting superintendent affirmed the finding of untrustworthiness—based upon petitioner placing "misleading advertisements, which could be read to describe the MBC contract as a promise to pay a fixed return within a definite period of time," and petitioner's failure to "disclose the risks [of viatical settlements] in his oral presentations to some of his clients"—but reduced the penalty to a fine of $10,500. Petitioner thereafter commenced this CPLR article 78 proceeding, subsequently transferred to this Court, to challenge respondent's determination.

Initially, we reject petitioner's contention that respondent is collaterally estopped from relying upon the relevant newspaper advertisement to sustain the finding of untrustworthiness. According to petitioner, because the former Department of Insurance looked into the advertisement in 2003 in terms of its compliance with the provisions of Insurance Law § 2122 and thereafter closed its file, concluding that the matter was "outside of [its] jurisdiction," respondent cannot now be heard to complain that the subject advertisement was misleading. Contrary to petitioner's assertion, this brief and investigative inquiry, which did not include any sort of evidentiary hearing or formal administrative adjudication, does not constitute the type of quasi-judicial determination subject to collateral estoppel (*see generally Auqui v Seven Thirty One Ltd. Partnership*, 22 NY3d 246, 255 [2013]; *ABN AMRO Bank, N.V. v MBIA Inc.*, 17 NY3d 208, 226-227 [2011]).

---

dollars. A federal court subsequently authorized the Securities and Exchange Commission to seize MBC's assets and place the company into receivership, whereupon investors were given the option of retaining, selling or forfeiting their interests in the viatical settlement(s) purchased. Although the insurance policies themselves survived, petitioner acknowledged that, "in most instances[,] there was no premium reserve account remaining to pay future premiums" on the subject policies; hence, those investors "who wished to retain their interest[s] were responsible for future premiums on a pro[ ]rata basis as provided in the [c]ontract" with MBC.

Turning to the merits, Insurance Law article 21 tasks respondent's superintendent with, among other things, the dual responsibility of "ensuring that licenses are issued only to trustworthy and competent [insurance] producers" (*Matter of Sullivan Fin. Group, Inc. v Wrynn*, 94 AD3d 90, 94 [2012]; *see* Insurance Law § 2104 [a] [1]) and disciplining any insurance producer who demonstrates untrustworthiness or incompetence (*see* Insurance Law § 2110 [a] [4] [B], [C]; *Matter of Sullivan Fin. Group, Inc. v Wrynn*, 94 AD3d at 94-95). These statutory mandates are designed "to protect the public by requiring and maintaining professional standards of conduct on the part of all insurance brokers acting as such within this state" (Insurance Law § 2104 [a] [2]). Respondent's superintendent is vested with broad discretion in this regard, and such "discretion extends to the determination of what constitutes untrustworthy conduct" (*Matter of Herman v Serio*, 28 AD3d 909, 910 [2006]; *see Matter of McKie v Corcoran*, 162 AD2d 535, 536 [1990], *lv denied* 76 NY2d 714 [1990]). Notably, " '[u]ntrustworthy' and 'incompetent' are terms of art, employed in this context in a broader sense that such terms are popularly used" (*Matter of McKie v Corcoran*, 162 AD2d at 536), and an administrative finding that a particular individual has demonstrated untrustworthiness or incompetence, if supported by substantial evidence in the record as a whole, must be confirmed (*see Matter of Herman v Serio*, 28 AD3d at 910; *Matter of Universal Sys. Ins. Agency v State of N.Y. Ins. Dept.*, 278 AD2d 238, 238 [2000]; *Matter of McKie v Corcoran*, 162 AD2d at 536).

Here, the finding that petitioner demonstrated untrustworthiness is grounded upon the misleading newspaper advertisement placed by petitioner and his failure to fully explain to certain clients the risks associated with viatical settlements. "The standard to be applied to determine whether an advertisement is misleading is not whether it is deceptive to the hypothetical reasonable person, but to 'the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions' " (*DeSantis v Sears, Roebuck & Co.*, 148 AD2d 36, 38 [1989], quoting *Guggenheimer v Ginzburg*, 43 NY2d 268, 273 [1977]; *see DeAngelis v Timberpeg E., Inc.*, 51 AD3d 1175, 1178 [2008]). As noted previously, the advertisement placed by petitioner boldly proclaimed "NOW THERE'S A BETTER ALTERNATIVE TO THE TRADITIONAL CD OR ANNUITY," represented that investors would "EARN 12-72% DOUBLE-DIGIT FIXED RETURN" and indicated that "12, 18, 24, 48, 60 or 72 Month Plans" were available. No mention of viatical settlements was made in the advertisement, and no disclaimers were contained therein.

Applying the foregoing standard to the quoted text, we agree with respondent's determination that the subject advertisement was misleading. As a starting point, the language at issue indeed could be read as suggesting that an investor would receive a fixed rate of return at the end of a predetermined period of time—a representation that was not universally true, as the timing of the payout was entirely dependent upon when the viator died; more to the point, the promised fixed rate of return could effectively be diminished if the viator exceeded his or her life expectancy, i.e., did not die within the "plan" period, and the investor's profit might be eliminated altogether if he or she was required to assume responsibility for paying the premiums due. The misleading nature of the advertisement relative to the promised fixed return and the monthly "plans" available—which were not plans at all but, rather, referred to the life expectancy of the viator—was exacerbated by the erroneous comparison of a viatical settlement to a traditional certificate of deposit or an annuity. Tellingly, petitioner was asked on cross-examination whether, as to a certificate of deposit and an annuity, "a purchaser could get two things: [a] fixed annual interest rate and a fixed date on when the purchaser would either receive a payment on the annuity or be able to withdraw money," in response to which petitioner stated, "Yes." Upon further questioning, petitioner acknowledged that, with respect to the viatical settlements that he sold to clients, an investor would receive neither "a fixed annual rate of return" nor "a date certain" upon which he or she "would get the investment back." Petitioner further conceded that, if investors wanted both a fixed rate of return and a date certain, then "MBC's viatical [settlement] would not have been the product for them" and, significantly, would not have been "a better alternative to a [certificate of deposit] or [an] annuity." Under such circumstances, there is ample support for respondent's finding that petitioner "placed misleading advertisements" and, in so doing, demonstrated untrustworthiness.

We reach a similar conclusion with respect to the finding that respondent failed to fully disclose the risks of viatical settlements to some of his clients. In this regard, respondent clarified—and the record confirms—that there is no dispute surrounding the terms of the contracts that the individual investors entered into and/or any of the written materials

provided by either petitioner or MBC.[3] Rather, respondent's finding that petitioner acted in an untrustworthy manner in this regard stems from petitioner's failure to "sufficiently disclose the risks in his oral presentations to some of his clients." Without recounting the extensive testimony adduced on this point, suffice it to say that the record contains conflicting evidence as to what petitioner did or did not say to investors regarding the nature and risks of viatical settlements. Petitioner and his witnesses insisted that it was petitioner's practice to "go through each paragraph" of the contract and explain each provision thereof to and "itemize[ ]" the risks associated with viatical settlements for each investor, and petitioner testified that he only utilized the words "safe," "safety" or "secure" in connection with the underwriting and/or ratings of the underlying insurance policies.[4] The complaining investors, on the other hand, variously testified that they did not actually understand the nature of viatical settlements— specifically, they either did not appreciate that the viator had to die in order collect on their investment, were unaware that the maturity date was not a fixed date or were not advised of the possibility of paying premiums on the underlying policies. In this regard, one investor testified that, although petitioner "told [her] where to initial and where to sign" the underlying contract, he "absolutely [did] not" review the provisions thereof with her, while another investor testified that petitioner assured her that investing in a viatical settlement "was as safe as a [certificate of deposit]." Such conflicting testimony presented a credibility issue for the Hearing Officer to resolve (*see Matter of Dona v Levin*, 263 AD2d 602, 604 [1999]; *Matter of Schermerhorn v Lewis*, 86 AD2d 934, 935 [1982], *lv denied* 56 NY2d 503 [1982]) and, as respondent's determination is supported by substantial evidence in the record as a whole, we discern no basis upon which to disturb it.

Finally, to the extent that petitioner argues that respondent's determination is internally inconsistent, we disagree. The mere fact that respondent, in reducing the penalty imposed

3. As noted in respondent's determination, "[t]hese materials disclose[d], in plain language, the nature of the contract, that it was the purchase of an interest in a life insurance policy, that the insured had to die before any payments would be received by the investor, that the life expectancies were estimates and not guaranteed to be accurate, and that, under certain circumstances, the investor might have to pay premiums."

4. It is apparent from petitioner's testimony, however, that—in terms of describing the nature and risks of viatical settlements—he relied more upon the language of the subject contracts than his "discussion[s]" with individual clients.

from revocation of petitioner's licenses to a fine, cited certain mitigating factors in support thereof in no way undermines the substantial evidence demonstrating that petitioner engaged in untrustworthy conduct. The remaining arguments raised by petitioner, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Peters, P.J., McCarthy, Rose and Mulvey, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.